UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-60448-Civ-COHN
MAGISTRATE JUDGE P. A. WHITE

EULIE POLANCO,                          :

       Petitioner,                 :

v.                                      :          REPORT OF

                                         MAGISTRATE JUDGE

WALTER A. McNEIL,                       :

       Respondent.                 :
_____

<u>Introduction</u>

Eulie Polanco has filed a <u>pro se</u> petition for writ of habeas corpus pursuant to 28 U.S.C. §2254, challenging the constitutionality of her convictions for first degree murder and aggravated battery entered following a non-jury verdict in Broward County Circuit Court, case no. 02-4837CF10A.

This Cause has been referred to the undersigned for consideration and report pursuant to 28 U.S.C. §636(b)(1)(B) and Rules 8 and 10 of the Rules Governing Section 2254 Cases in the United States District Courts.

For its consideration of this petition (DE#1), the Court has the response of the state with multiple exhibits (DE#s11-12), and the petitioner's reply (DE#13).

The petitioner raises the following 11 claims:

    1.    She was denied effective assistance of counsel, where her lawyer failed to seek disqualification of the judge during trial on the basis that the

presiding judge may have been having a relationship with an attorney in the prosecutor's office. (DE#1:6).

2.   She was denied effective assistance of counsel, where her lawyer failed to object to the testimony of a prosecution witness on the basis that the witness had violated the rule of sequestration. (DE#1:7).

3.   She was denied effective assistance of counsel, where her lawyer failed to interview potential witnesses to support the petitioner's insanity defense. (DE#1:9).

4.   She was denied effective assistance of counsel, where her lawyer misadvised her to forego a jury trial and proceed with a non-jury trial on the basis that she would be unable to obtain an unbiased jury. (DE#1:10).

5.   She was denied effective assistance of counsel, where her lawyer failed to object and move to strike any notes made by Dr. Shapiro on the basis that the petitioner had not waived her right to privacy and confidentiality. (DE#1:12A).

6.   She was denied effective assistance of counsel, where her lawyer was operating under a potential conflict of interest. (DE#1:12B).

7.   The cumulative errors by counsel deprived the petitioner of a fundamentally fair trial. (DE#1:12C).

8.   She was denied effective assistance of counsel, where her lawyer failed to advise the court that the petitioner had stopped taking her psychotropic medication at the time she waived her right to a jury trial, thereby rendering her waiver not knowing and voluntary. (DE#1:12D).

9.   The trial court erred in admitting the testimony of Dr. Sheri Bourg-Carter as an expert, where there was an insufficient predicate to permit her testimony, that was based on speculation and facts not in evidence, in violation of the petitioner's constitutional rights. (DE#1:12E).

10. The trial court erred in overruling the petitioner's objection to the prosecution's hypothetical question posed to Dr. Bourg-Carter regarding whether a generally depressed homicide suspect could become psychotic following a suicide attempt once the suspect regains consciousness in the hospital and learns that her child is dead. (DE#1:12F).

11. The trial court erred in failing to recognize the privileged and confidential nature of the mediation proceedings. (DE#1:12G).

<u>Procedural History</u>

The procedural history of the underlying state court convictions reveals as follows. On March 23, 2002, the petitioner was charged by Indictment with first degree murder (Count 1) and aggravated child abuse (Count 2), as a result of her causing the death of her infant, two-year old daughter D.P. ("the victim") on March 22, 2002. (DE#12:Ex.1:3-5). Prior to trial, the petitioner filed a notice intending to rely on insanity as one of her defenses at trial. (DE#12:Ex.1:36,59).

The petitioner also filed a pretrial motion to quash a subpoena issued to Diane Blank, a mediator in the petitioner's divorce proceedings. (DE#12:Ex.1:66-67). The petitioner argued that Blank was precluded from testifying pursuant to <u>Fla.Stat.</u> §44.102 and a confidentiality clause in the mediation agreement. (DE#12:Ex.1:12-14). The prosecution argued, however, that only communications during the mediation were privileged, not the observations of the participants. (DE#12:Ex.1:14-15). The court permitted the observation testimony, finding that the timing of the mediation, which occurred one day prior to the murder, was relevant because the petitioner had placed her mental state at issue. (<u>Id</u>.:18-19). However, the communications made during the mediation

3

were privileged and would not be allowed in evidence. (<u>Id</u>.). Additionally, the record reveals that the prosecution waived the death penalty, and the petitioner waived her right to a jury trial. (DE#12:Ex.3:15-19).

Eventually, the petitioner proceeded to trial where she was found guilty as charged, following a bench trial. (DE#12:Ex.1:88-92). She was adjudicated guilty and sentenced to a term of life imprisonment without parole as to Count 1, and the court withheld imposition of sentence as to Count 2. (DE#12:Ex.1:88-100).

The petitioner appealed, raising claims nine, ten, and eleven of this federal petition, as listed above. (DE#12:Ex.4). On January 4, 2006, the Fourth District Court of Appeal *per curiam* affirmed the petitioner's convictions and sentences in a written, published opinion. <u>Polanco v. State</u>, 917 So.2d 1010 (Fla. 4 DCA 2006); (DE#12:Ex.7). Thus, the judgment of conviction became final, for purposes of the federal AEDPA's one year statute of limitations, at the latest on April 4, 2006, ninety days following the affirmance of the convictions and sentences on direct appeal.[1]

The AEDPA's one-year limitations period ran unchecked for over eight months, from April 4, 2006 until December 29, 2006, when the petitioner returned to the state court filing her first motion for postconviction relief pursuant to <u>Fed.R.Cr.P.</u> 3.850 with numerous amendments thereto, raising claims one through nine of this habeas petition, as listed above. (DE#12:Exs.8,9,11). After receiving

---

[1]For federal purposes, a conviction is final when a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied. <u>Griffith v. Kentucky</u>, 479 U.S. 314, 321, n.6 (1986); <u>accord</u>, <u>Bond v. Moore</u>, 309 F.3d 770 (11 Cir. 2002); <u>Coates v. Byrd</u>, 211 F.3d 1225 (11 Cir. 2000). Ordinarily, a petition for writ of certiorari must be filed within 90 days of the date of the entry of judgment, rather than the issuance of a mandate. Supreme Court Rule 13.

responses from the state, the trial court entered orders denying the motions based on the state's responses. (DE#12:Exs.12,15,19). Those denials were ultimately *per curiam* affirmed by the Fourth District Court of Appeal in a written, published opinion. <u>Polanco v. State</u>, 983 So.2d 566 (Fla. 4 DCA 2008); (DE#12:Ex.23). The mandate issued on December 19, 2008. (DE#12:Ex.23).

The AEDPA limitations period again ran unchecked for three months, from December 19, 2008 until March 19, 2009, when the petitioner then came to this court timely filing this federal habeas corpus petition.[2] (DE#1). The petition was filed after April 24, 1996, the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104-132, 110 Stat. 1214 (1996). Consequently, post-AEDPA law governs this action. <u>Abdul-Kabir v. Quarterman</u>, 550 U.S. 233, 127 S.Ct. 1654, 1664, 167 L.Ed.2d 585 (2007); <u>Penry v. Johnson</u>, 532 U.S. 782, 792, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001); <u>Davis v. Jones</u>, 506 F.3d 1325, 1331, n .9 (11 Cir. 2007). The respondent concedes correctly that this petition was filed within the one-year limitations period of 28 U.S.C. §2244, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, <u>Artuz v. Bennett</u>, 531 U.S. 4 (2000) (pendency of properly-filed state postconviction proceedings tolls the AEDPA limitations period).

The respondent further concedes that the claims raised in this federal petition have been properly exhausted in the state forum and are thus ripe for federal review. Issues raised in a federal habeas corpus petition must have been fairly presented to the state courts and thereby exhausted. <u>Anderson v. Harless</u>, 459 U.S. 4 (1982); <u>Hutchins v. Wainwright</u>, 715 F.2d 512 (11 Cir. 1983).

---

[2]<u>See</u>: <u>Adams v. United States</u>, 173 F.3d 1339 (11 Cir. 1999) (prisoner's pleading is deemed filed when executed and delivered to prison authorities for mailing).

Exhaustion requires that a claim be pursued in the state courts through the appellate process. <u>Leonard v. Wainwright</u>, 601 F.2d 807 (5 Cir. 1979). Both the factual substance of a claim and the federal constitutional issue itself must have been expressly presented to the state courts to achieve exhaustion for purposes of federal habeas corpus review. <u>Baldwin v. Reese</u>, 541 U.S. 27 (2004); <u>Gray v. Netherlands</u>, 518 U.S. 152 (1996); <u>Duncan v. Henry</u>, 513 U.S. 364 (1995); <u>Picard v. Connor</u>, 404 U.S. 270 (1971).

### Facts Adduced At Trial

For an appreciation of the plethora of issues raised in this habeas proceeding, a full review of the facts adduced at trial is essential. Marly Larochelle, a good friend of the petitioner for nine years, testified that the petitioner visited her in Orlando in early March 2002, during which she had placed a downpayment on a house in the Orlando area.[3] (T.34).[4] On March 22, 2002, Larochelle testified that the petitioner called her to tell her that she had killed her daughter and was going to kill herself. (T.35). Larochelle told her not to do it, handed the phone to her husband, Mario Clervaux, who then spoke with the petitioner,[5] while Larochelle family members called 911 using a cellular phone. (T.35-37).

Earlier that day, the petitioner had dropped off the victim

---

[3]LaRochelle's husband also indicated that the petitioner wanted to start a new life and was in the process of getting a job in the Orlando area. (T.48-49).

[4]The letter "T" in this Report refers to the trial transcripts which have been filed by the respondent as part of the Appendix. <u>See</u> DE#12:Ex.2.

[5]While Clervaux was speaking with the petitioner, instructing her to try giving her daughter CPR, the petitioner indicated she was taking her life as well. (T.46). Clervaux recalled hearing noises that sounded like the petitioner was stabbing herself. (T.47-48).

with her caretaker, Maria Gueirrez, who normally watched the victim all day. (T.78-80). On March 22nd, Gueirrez recalled the petitioner telling her about her divorce and how she did not want the victim visiting her father, but would accept the court's decision in this regard. (T.80-81). That same date, the petitioner called Gueirrez around 12:30 p.m., to inform her she would be picking up her daughter early because she had a doctor's appointment. (T.83). Gueirrez claims the petitioner was neither in distress nor crying when she picked up the victim, and in fact, discussed her plans to move to Orlando. (T.83-84). Gueirrez did recall, however, that several months prior thereto, the petitioner had mentioned thoughts of driving her car into a canal, and believes that the petitioner was fostering much resentment against her husband. (T.84-90).

Miramar Police Detective Jeff Armiento testified that he responded to the petitioner's residence at 1:53 p.m. on March 22nd, 2002. (T.57-58). At that time, he observed blood in the hallway, outside the bathroom, as well as, the petitioner and the victim naked in the bathtub. (T.59). Both individuals were on their backs, and he could discern no movement from either one. (T.59). He then noticed a wound to the petitioner's throat, a wound to her abdomen, and lacerations to the petitioner's wrists and heel. (T.63,66).

Captain Peter Gurdak with the Miramar Fire Rescue testified he also responded to the scene, and saw the petitioner, who had shallow respiration, but did not see the victim. (T.67-69). He recalled that a plugged in hair dryer and/or curling iron was dropped in the bathtub. (Id.). He then unplugged the appliance which was still warm. (T.67-71). The rescue team apparently did not find the victim until the petitioner was removed from the tub, which was filled with water to the overflow drain. (T.71-74).

7

Barbie Calderbank, a paramedic with the Miramar Fire Department, testified that she treated the victim at the scene, at which time the victim had no pulse, and was not breathing. (T.92-93). The victim was blue, vomiting up fluids, and attempts to revive the victim were futile, as the victim was dead by the time she arrived at the hospital. (T.93-95).

Anna Fradley, the petitioner's coworker,[6] testified that she saw the petitioner at work on the morning of March 22nd. (T.97,103). That day, while the petitioner seemed distracted, she was able to do her job. (T.103). Fradley recalled that in the preceding months, the petitioner appeared sad and would sometimes cry. (T.104). On March 22nd, Fradley spoke with the petitioner, who indicated that her divorce mediation had gone better than expected, but expressed discontent with the fact that her husband would have visitation with the victim. (T.105-106). The petitioner, however, indicated this visitation would occur "over her dead body." (T.106). Fradley recalled that the petitioner had lost weight, took long lunches, and seemed generally depressed in the months prior to the murder. (T.109).

Associate Medial Examiner Dr. Linda O'Neil testified that her examination of the victim revealed petechial hemorrhages on the face and in one eye. (T.175). The hemorrhages mean that something increased the pressure in the capillaries of the face and eyes, causing them to burst. (T.175-76). The hemorrhages, however, did not come from drowning or electrocution. (T.176). According to Dr. O'Neil, it would take a very severe squeeze to cause the

---

[6]The petitioner's supervisor and general manager, Saril Williamson, testified he saw the petitioner on the day of the murder, and claims there was nothing in the petitioner's behavior in the days and weeks preceding the murder that would cause him to be concerned over her mental condition. (T.119). According to Williamson, the petitioner did her job well, and there was no conduct or behavior which interfered with her performance. (T.119).

hemorrhages. (T.192). Moreover, Dr. O'Neil concluded that the victim's death was caused by drowning, which was not accidental. (T.195,199).

Broward County Sheriff's Deputy Mark Suchomel testified that he arrived at the crime scene to investigate the murder of the petitioner's child. (T.219-220). He had a search warrant and obtained a hair dryer, iron, and a knife from the residence. (T.220). He also seized a letter from the residence addressed to the petitioner's husband, which was then introduced at trial, in which the petitioner indicated that despite attempts by the husband and his family to take the victim from her, the victim would forever remain with the petitioner, and hoped she taught him a good lesson. (T.227-228). In that letter, the petitioner further directed that she wanted to be next to her daughter, and that she did not want to be cremated, and wanted both she and the victim to wear night gowns and no shoes for the funeral. (Id.).

Likewise, Marsha Rubio, the petitioner's friend and victim's godmother, testified that on the day of the murder, after speaking with the petitioner, she later discovered a letter from the petitioner in her mailbox with "post-it" notes on the outside, stating that she and the victim loved her but would be gone, and requesting that Rubio pray for them. (T.242).

Polanco's divorce attorney, Gerard Cutrone, testified that he had contact with the petitioner on March 21st, 2002, during the divorce mediation proceedings. (T.129-134). Cutrone recalled that nothing in the petitioner's behavior caused him concern enough to request a competency evaluation. (T.135). In fact, the petitioner had no problem speaking, negotiating, or interacting during the mediation, and even signed the mediation agreement, which provided

that the husband would have visitation with the victim on March 22nd. (T.135-137).

Likewise, the divorce mediator, Diane Blank, also testified at trial regarding her observations of the petitioner during the mediation. (T.205-06). In response to the prosecution's question, Blank stated that if she perceived there was an observable threat that someone might be a danger to themselves or others, she would immediately stop a mediation.[7] (Id.). Such was not the case here. (T.216). In this case, Blank recalled that the petitioner was dressed appropriately and spoke properly during the proceedings, although at times she was crying. (T.207,212).

The petitioner called Dr. Amy Swan, a clinical and forensic psychologist, to testify at trial. (T.274-278). Testing conducted by Dr. Swan on the petitioner revealed that the petitioner was having major depressive episodes with psychotic features, and that the petitioner had some maladaptive personality traits. (T.284-89). Based on her tests, as well as review of records, Dr. Swan opined that the petitioner was legally insane at the time she murdered her infant, two-year old daughter. (T.315). Dr. Swan indicated that at the time of the offenses, the petitioner's thought process was distorted, and the petitioner so delusional that she became convinced her ex-husband was going to take their child away permanently to another country, and her only way out was to kill herself and the child. (T.299-300).

During cross-examination, however, Dr. Swan admitted that someone could be floridly psychotic and sane. (T.319). She conceded that one of her reports indicated that the petitioner had

---

[7]In fact, ethical guidelines and standards would prevent Blank from going forward with a mediation when she knows they are unfit to proceed. (T.216). However, that was not the case here. (T.216).

indicators of being prone to exaggeration. (T.322). She further admitted that the petitioner had the ability to be coached on a test, and that there were some inconsistencies on the results of the test she administered. (T.33-334). In forming her opinion, Dr. Swan relied upon the petitioner's statements that she never thought to kill her daughter until after she arrived home on the day of the murder. (T.341). However, Dr. Swan conceded that the petitioner's statement in this regard was disingenuous in light of the fact that the petitioner had left a suicide note in a friend's mailbox indicating that she and the victim were already "gone." (Id.). In fact, by the time the petitioner dropped off the letter, she had already decided to kill her daughter. (T.345). In fact, the petitioner used logic and problem-solving while murdering her daughter. (T.348). She attempted first to suffocate the victim, then to electrocute her, finally drowning the victim. (T.348-350).

Dr. Swan further acknowledged that the petitioner's request for forgiveness may indicate that she knew she had done something wrong. (T.360). Dr. Swan also explained that someone can be psychotic and still know right from wrong. (T.365). According to Dr. Swan, the petitioner's suicide note shows anger towards her husband, and demonstrates some organization. (T.369).

The prosecution called Dr. Bourg-Carter, a forensic psychologist, as a rebuttal witness and expert. (T.383). According to the doctor, review of the nurses notes while the petitioner was in jail failed to reveal that the petitioner was floridly psychotic at the time she was administered a second psychological test. (T.404-06). There was nothing in the notes to reflect that the petitioner was acting crazy or psychotic. (T.406-07). In fact, the Million test given did not reflect that the petitioner was psychotic. (T.408). The expert explained that any inconsistencies

11

between the MMPI test and the Million test can be explained by whatever the individuals did during the initial administration of the tests. (T.410-11).


<u>Discussion of the Claims</u>


Turning to the merits of the claims raised in the collateral proceeding, Section 104(d) of the AEDPA [28 U.S.C. §2254(d)] sets out a significant new restriction upon the ability of federal courts to grant habeas corpus relief. Under the AEDPA, the standard of review "is 'greatly circumscribed and highly deferential to the state courts.' <u>Crawford v. Head</u>, 311 F.3d 1288, 1295 (11 Cir. 2002)." <u>Stewart v. Sec'y Dep't of Corr</u>., 476 F.3d 1193, 1208 (11 Cir. 2007). <u>See also</u> <u>Parker v. Sec'y Dep't of Corr</u>., 331 F.3d 764 (11 Cir. 2003). The AEDPA altered the federal court's role in reviewing state prisoner applications in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." <u>Bell v. Cone</u>, 535 U.S. 685, 693 (2002).

A federal court must afford a high level of deference to the state court's decision. <u>See</u> <u>Ferguson v. Culliver</u>, 527 F.3d 1144, 1146 (11 Cir. 2008); <u>Parker v. Sec. Dept. of Corrections</u>, 331 F.3d at 768. Consequently, a federal court may not grant habeas relief with respect to any claim adjudicated on the merits in state court unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d). The statutory phrase "clearly established Federal law" "refers to the holdings, as opposed to the dicta, of [the U.S. Supreme] Court's decisions as of the time of the relevant state-court decision." <u>Williams v. Taylor</u>, 529 U.S. 362, 412, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000)(majority opinion by O'Connor, J.).

"[A] state court's decision is not 'contrary to ... clearly established Federal law' simply because the court did not cite [Supreme Court] opinions.... [A] state court need not even be aware of [Supreme Court] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" <u>Mitchell v. Esparza</u>, 540 U.S. 12, 16 (2003)(<i>quoting</i> <u>Early v. Packer</u>, 537 U.S. 3, 7-8 (2002). Even where a state court denies an application for post-conviction relief without written opinion, that decision constitutes an "adjudication on the merits," and is thus entitled to the same deference as if the state court had entered written findings to support its decision. <u>See</u> <u>Wright v. Sec. of Dep't of Corr</u>., 278 F.3d 1245, 1255 (11 Cir. 2002). Moreover, findings of fact by the state court are presumed correct, and the petitioner bears the burden of rebutting that presumption of correctness by <i>clear and convincing evidence</i>. <u>See</u> 28 U.S.C. §2254(e)(1); <u>Miller-El v. Dretke</u>, 545 U.S. 231, 240 (2005); <u>Crowe v. Hall</u>, 490 F.3d 840, 844 (11 Cir. 2007), <i>cert. denied</i>, ___ U.S. ___, 128 S.Ct. 2053 (2008); <u>Henderson v. Campbell</u>, 353 F.3d 880, 889-90 (11th Cir. 2003).

As will be demonstrated in more detail <i>infra</i>, the petitioner is not entitled to vacatur on any of the claims presented.[8] When

---

[8]Briefly, as narrated previously in this Report, the evidence against the petitioner was more than sufficient to support her convictions. The petitioner has not shown that the result of the trial or appeal would have been affected had counsel proceeded differently. In other words, no deficient performance or

viewing the evidence in this case in its entirety, the alleged errors raised in this collateral proceeding, neither individually nor cumulatively, infused the proceedings with unfairness as to deny the petitioner a fundamentally trial and due process of law. The petitioner therefore is not entitled to habeas corpus relief. See Fuller v. Roe, 182 F.3d 699, 704 (9 Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation), overruled on other grounds, Slack v. McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10 Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect."). Contrary to the petitioner's apparent assertions, the result of the proceedings were not fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993).

## Ineffective Assistance of Counsel Claims

The petitioner raises multiple challenges to counsel's effectiveness, which are subject to the two-part test enunciated in Strickland v. Washington, 466 U.S. 668 (1994), which is not a favorable standard. See Massaro v. United States, 538 U.S. 500, 505 (2003). To prevail on a claim of ineffective assistance, a petitioner must demonstrate both that (1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness; and (2) the deficient performance prejudiced the

---

prejudice pursuant to Strickland has been established arising from any of the claims raised in this collateral proceedings, nor has a denial of due process been demonstrated. To the contrary, it is clear after independent review of the record that the petitioner received a fair trial, and that no constitutional violations occurred. Consequently, she has failed to demonstrate that she is entitled to habeas corpus relief in this collateral proceeding.

14

defendant. <u>Chandler v. United States</u>, 218 F.3d 1305, 1312-13 (11th Cir. 2000)(<u>en banc</u>), <u>cert</u>. <u>denied</u>, 531 U.S. 1204 (2001). ; <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). Moreover, a habeas court's review of a claim under the Strickland standard is "doubly deferential." <u>Knowles v. Mirzayance</u>, ___ U.S. ___, 129 S.Ct. 1411, 1418, 173 L.Ed.2d 251 (2009).

        In deciding whether counsel's performance was deficient, judicial scrutiny is "highly deferential" and requires us to "'indulge [the] strong presumption that counsel's performance was reasonable and that counsel made all significant decisions in the exercise of reasonable professional judgment.'" <u>Id</u>. at 1314 (<u>quoting</u> <u>Strickland v. Washington</u>, 466 U.S. at 689-90; <u>Chandler v. United States</u>, 218 F.3d 1305 (11 Cir. 2000)(en banc), <u>cert</u>. <u>denied</u>, 531 U.S. 1204 (2001). The court's role in reviewing ineffective assistance of counsel claims is not to "grade a lawyer's performance; instead, [the court] determine[s] only whether a lawyer's performance was within "the wide range of professionally competent assistance." <u>Van Poyck v. Florida Dept. of Corrections</u>, 290 F.3d 1318, 1322 (11 Cir.), <u>cert</u>. <u>denied</u>, 537 U.S. 812 (2002), <u>quoting</u>, <u>Strickland v. Washington</u>, 466 U.S. 668, 690. Review of counsel's conduct is to be highly deferential. <u>Spaziano v. Singletary</u>, 36 F.3d 1028, 1039 (11 Cir. 1994), and second-guessing of an attorney's performance is not permitted. <u>White v. Singletary</u>, 972 F.2d 1218, 1220 (11 Cir. 1992)("Courts should at the start presume effectiveness and should always avoid second-guessing with the benefit of hindsight."); <u>Atkins v. Singletary</u>, 965 F.2d 952, 958 (11 Cir. 1992). A claim of ineffective assistance is a mixed question of law and fact. <u>Strickland</u>, 466 U.S. at 698.

        The Eleventh Circuit will not "second-guess counsel's strategy." <u>Chandler</u>, 218 F.3d at 1314, n.14. Strategic choices,

even those "made after less than complete investigation," are evaluated for their reasonableness and "counsel's reliance on particular lines of defense to the exclusion of others--whether or not he investigated those other defenses--is a matter of strategy and is not ineffective unless the petitioner can prove the chosen course, in itself, was unreasonable." Chandler, 218 F.3d at 1318 (quoting Strickland, 466 U.S. at 690-91).

The courts "are not interested in grading lawyers' performances;" but rather, "are interested in whether the adversarial process at trial...worked adequately." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994)(quotation marks omitted). To be unreasonable, the performance must be such that "no competent counsel would have taken the action that [the petitioner's] counsel did take." Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001)(emphasis omitted). In other words, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d at 386.

Under the second prong of the test set forth in Strickland, the petitioner can be said to have been prejudiced by counsel's performance only if there was "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Rather, the petitioner must demonstrate that "there is a reasonable probability that, absent [counsel's] errors, the jury would have had a reasonable doubt regarding [his] guilt." Blackburn v. Foltz, 828 F.2d 1177, 1186 (6th Circ. 1987), cert. den'd, 485 U.S. 970 (1988), see also, Montgomery v. Petersen, 846 F.2d 407,

16

416 (7th Cir. 1988).

However, it is well settled that tactical or strategic choices by counsel cannot support a collateral claim of ineffective assistance. United States v. Costa, 691 F.2d 1358 (11 Cir. 1982); Coco v. United States, 569 F.2d 367 (5 Cir. 1978). Even if such a decision in retrospect appears incorrect, it can constitute ineffective assistance only "if it was so patently unreasonable that no attorney would have chosen it," Adams v. Wainwright, 709 F.2d 1443, 1445 (11 Cir.), cert. denied, 464 U.S. 1663 (1984), or if the petitioner can demonstrate a "reasonable probability that the verdict [otherwise] would have been different." Kimmelman v. Morrison, 477 U.S. 365, 375 (1986).

Decisions whether to call a particular witness or cross-examine certain witnesses are generally questions of trial strategy. See United States v. Costa, 691 F.2d 1358 (11 Cir. 1982). However, where counsel failed to investigate and interview promising witnesses, and therefore "ha[s] no reason to believe they would not be valuable in securing [defendant's] release," counsel's inaction constitutes negligence, not trial strategy. Workman v. Tate, 957 F.2d 1339, 1345 (6th Cir. 1992)(quoting United States ex rel. Cosey v. Wolff, 727 F.2d 656, 658 n.3 (7th Cir. 1984)). Nevertheless, strategic choices made after thorough investigation of the law and facts relevant to plausible options are virtually unchallengeable. Strickland v. Washington, 466 U.S. at 690-91.

In **claim one**, the petitioner asserts that she was denied effective assistance of counsel, where her lawyer failed to seek disqualification of the judge during trial on the basis that the presiding judge may have been having a relationship with a prosecutor, who although was not directly involved in the case,

17

was at times present in the courtroom, observing the petitioner's trial. (DE#1:6; DE#12:Ex.9-See Attached Affidavits, Motion to Recuse,[9] and letter).[10] The petitioner maintains that despite counsel's discussion regarding the issue with the judge in chambers, "off the record," counsel should have nevertheless filed the motion seeking to disqualify the judge. (DE#12:Ex.8:3).

It is well settled that the accused in any criminal trial is guaranteed the right to an impartial tribunal. See Nethery v. Collins, 993 F.2d 1154, 1157 (5 Cir. 1993), cert. denied, 511 U.S. 1026 (1994); Bradshaw v. McCotter, 785 F.2d 1327, 1329 (5 Cir.), modified, 796 F.2d 100 (5 Cir. 1986). The judge's bias must be personal and extrajudicial, deriving from something other than the case. See Liteky v. United States, 510 U.S. 540, 555 (1994). See also McWhorter v. City of Birmingham, 906 F.2d 674, 678-79 (11 Cir. 1990); see also, Wiley v. Wainwright, 793 F.2d 1190, 1193 (11 Cir. 1986). The appearance of bias, however, is insufficient to establish a due process violation requiring recusal of state judge. See Davis v. Johnson, 506 F.3d 1325 (11 Cir. 2007).[11]

---

[9]The motion for recusal reflects that defense counsel observed during trial, on September 25, 2003, immediately after breaking for lunch, the presiding judge and a prosecutor who had been observing the trial, walk towards an elevator together, and rather than ride in the elevator with the defense, chose to wait for another elevator. Defense counsel was advised, however, that the particular prosecutor, although formerly assigned to the judge's division, did not currently handle any cases before that judge.

[10]The exhibits include an affidavit from petitioner's co-counsel, Alfreda D. Coward, an affidavit from Diane M. Cuddihy, the then chief assistant federal public defender, the proposed motion for disqualification of the trial judge which was not filed, and a February 7, 2007 letter from Attorney Cuddihy to the petitioner. (DE#12:Ex.9:Exs.A-E).

[11]In Davis, the habeas petitioner contended that his due process rights were violated because the juvenile court judge presiding over one of the hearings in his case was the brother of one of the prosecutors. Davis, 506 F.3d at 1326. However, no actual bias was shown. Id. at 1331. Instead, the petitioner contended that the appearance of partiality-the fact that the judge's impartiality might reasonably be questioned in those circumstances-was enough to make out a due process violation. Id. After surveying Supreme Court decisions in this area, and noting that the Eleventh Court and at least two other circuits had held that an

In this case, when the identical claim was raised in the Rule
3.850 proceeding, the trial court denied the claim (DE#12:Ex.12),
based on the state's response which argued, in pertinent part, as
follows:

> ...The State would contend that this matter is
> legally insufficient, as *inter alia*, no
> reasonable probability exists that any motion
> for recusal or disqualification on these
> grounds would have been granted, and Defendant
> Polanco has otherwise failed to demonstrate
> prejudice. [citations omitted]... At most,
> Defendant Polanco points to 'a possible affair
> or association with another State Attorney
> [*i.e.,* a prosecutor other than the trial
> prosecutor] and the Judge presiding over the
> trial.' (Amended Motion at Ground 1). This
> would be an insufficient basis for recusal or
> disqualification and would likewise be
> insufficient to establish actual bias on the
> part of the Court. Accordingly, the instant
> claim for relief should be summarily DENIED in
> all respects.

(DE#12:Ex.10:3-4).

That denial was subsequently affirmed on appeal, Polanco v.
State, 993 So.2d 566, 566-67 (Fla. 4 DCA 2008), where the appellate
court, found in pertinent part, as follows:

> Although affidavits are attached to the motion
> for postconviction relief to support the
> grounds for disqualification, none of them
> confirm the acts of personal conduct alleged
> in the motion. Both the motion and the
> supporting affidavits rely on information
> about the trial judge from unnamed court

---

appearance of bias is not enough to violate the Due Process Clause, id. at
1333-35, the Eleventh Circuit concluded that the state courts' rejection of the
petitioner's contention was not contrary to, or an unreasonable application of,
clearly established federal law as determined by the Supreme Court. Id. at 1337.

> personnel passed to the persons signing the
> affidavit....Finally, the *objective* informa-
> tion contained in the motion (but not in the
> affidavits), as opposed to the rumor and
> courthouse gossip, is legally insufficient to
> support the standard for disqualification,
> i.e., that a reasonable prudent person would
> fear that he or she could not get a fair
> trail...

(DE#12:Ex.23).

As found correctly both by the trial court and the appellate court affirming rejection of the claim, under Florida law, disqualification cannot be based on rumors or gossip, but rather must be based upon a defendant's "well-founded objective" fear that she will not receive a fair hearing. See <u>Fla.R.Jud.Admin</u>. 2.160(d)(1); <u>See</u> <u>e.g.</u>, <u>Arbelaez v. State</u>, 898 So.2d 25, 41 (Fla. 2005); <u>State v. Shaw</u>, 643 So.2d 1163, 1164 (Fla. 4 DCA 1993)(defendant's fear of judicial bias must be "objectively reasonable). It cannot be based upon rumors or gossip. <u>Barwick v.</u> <u>State</u>, 660 So.2d 685, 693 (Fla. 1995). The petitioner has failed to establish an objective fear that she would not receive a fair trial if the case went forward with the assigned judge.

Moreover, no prejudice has been demonstrated arising from counsel's failure to pursue this claim. Even if the motion had been timely filed, the petitioner has failed to establish that the motion would be have been granted. To the contrary, the record clearly demonstrates that the motion was legally insufficient. Therefore, the trial court's determination that the petitioner was not entitled to postconviction relief on the ineffective assistance of counsel claim, which decision was affirmed on appeal was not in conflict with clearly established federal law or based on an unreasonable determination of the facts in light of the evidence

presented in the state court proceedings. Relief must therefore be denied pursuant to 28 U.S.C. §2254(d). <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).

In **claim two**, the petitioner asserts that she was denied effective assistance of counsel, where her lawyer failed to object to the testimony of a prosecution witness on the basis that the witness had violated the rule of sequestration. (DE#1:7). This claim is refuted by the record and also meritless.

Review of the record reveals that when the prosecution sought to call Dr. Bourg-Carter, a forensic psychologist, as an expert rebuttal witness, counsel objected, arguing that the witness had been in the courtroom when defense expert, Dr. Swan testified. (DE#12:Ex.10). The court overruled the objection, on the finding that counsel had failed to previously object to the witness' presence, and alternatively, that experts are often exempted from the rule of sequestration. (T.383-86).

In Florida, the rule of sequestration provides that: "[A]t the request of a party the court shall order, or upon its own motion the court may order, witnesses excluded from a proceeding so that they cannot hear the testimony of other witnesses...." <u>Fla.Stat</u>. §90.616(1)). The rule is designed to avoid the testimony of one witness improperly influencing that of another and to aid in the detection of disingenuous testimony, thereby discouraging fabrication, inaccuracy and collusion. <u>See</u> <u>Geders v. United States</u>, 425 U.S. 80, 87 (1976); <u>Knight v. State</u>, 746 So.2d 423, 430 (Fla. 1998); <u>Gore v. State</u>, 599 So.2d 978, 986 (Fla. 1992). It is also well settled in Florida that, even where a witness has violated the sequestration rule, the determination of whether that witness will thereafter be permitted to testify is within the sound judicial

discretion of the trial court. <u>Rollins v. State</u>, 256 So.2d 541, 541 (Fla. 4 DCA 1972).

However, <u>Fla.Stat.</u> §90.616(2)(c) provides that: "[A] witness may not be excluded if the witness is a person whose presence is shown by the party's attorney to be essential to the presentation of the party's cause." <u>Fla.Stat.</u> §90.616(2)(c); <u>See also</u>, <u>Burns v. State</u>, 609 So.2d 600, 606 (Fla. 1992); <u>Strausser v. State</u>, 682 So.2d 539, 540-41 (Fla. 1996)(citing §90.616(2)(c), finding no error where mental health expert allowed to remain in courtroom while defendant testified).

Notwithstanding, under federal law, a state trial court's refusal to exclude witnesses from the courtroom until they testify is not a denial of due process. <u>See</u> <u>Ashker v. Class</u>, 152 F.3d 863, 872-73 (8 Cir. 1998)(holding in habeas corpus proceeding that failure of prosecution to ensure that daughter of murder victim, who testified at trial, was not in courtroom during jury selection and while other witnesses were testifying, was not so egregious as to fatally infect trial and render it fundamentally unfair, causing denial of due process); <u>Bell v. Duckworth</u>, 861 F.2d 169, 170 (7 Cir. 1988)(holding in a §2254 proceeding that petitioner's complaint that judge's refusal to order the prosecution witnesses to leave the courtroom during the voir dire of the jury did not deprive petitioner of due process right to fair trial).

In the state forum, where the identical claim was raised in the Rule 3.850 proceeding, the court denied the claim based on the prosecution's response thereto, which argued in pertinent part:

> ...This claim is legally insufficient....The State would contend that the Defendant Polanco has failed to demonstrate prejudice from any

alleged omission of counsel. As the Court
noted, expert witnesses are often exempted
from the rule of sequestration...and no
reasonable probability exists that the Court
would have excluded Dr. Bourg-Carter's
testimony, upon defense counsel's motion.
Further, the record reflects that Dr. Bourg-
Carter testified only as to the methodology of
certain psychological testing and offered no
opinion testimony as to Polanco's sanity at
the time of the offense, and the record would
not support any allegation that Dr. Bourg-
Carter's testimony was in any way improperly
'colored' by the prior testimony of Dr. Swan.
(See Attachment A; Transcript at R386-432).
Accordingly, the instant claim for relief
should be summarily DENIED in all respects.

(DE#12:Ex.10:4).

That denial was subsequently summarily affirmed on appeal.
Polanco v. State, 993 So.2d 566 (Fla. 4 DCA 2008); (DE#12:Ex.23).

The record reveals that the trial court did not abuse its
discretion in the instant case when it overruled counsel's
objection and permitted Dr. Bourg-Carter to testify as to the
methodology of certain psychological testing. Under federal and
state law principles, no due process violation occurred when he was
permitted to remain in the courtroom. See Ashker v. Class, 152 F.3d
at 872-73.

Thus, there is no reasonable probability that had defense
counsel taken the action suggested by the petitioner that the
outcome of the trial would have been different.[12] See Strickland v.

─────────────────────

[12]In fact, after independent review of the record, this Court finds nothing
of record to support the petitioner's allegation that Dr. Bourg-Carter's
testimony was improperly colored by the prior testimony of Dr. Swan, the
defense's expert. (See T.386-422). Thus, for this alternative reasons, the
petitioner cannot establish prejudice pursuant to Strickland and is entitled to
no relief on his claim that he suffered prejudice arising from counsel's failure

23

<u>Washington</u>, <u>supra</u>. Accordingly, defense counsel did not render constitutionally ineffective assistance when he did not further pursue the matter and when he did not preserve the issue for appellate review. <u>See</u> <u>Davis v. Secretary for Dept. of Corrections</u>, 341 F.3d 1310, 1316 (11 Cir. 2003), <u>citing</u>, <u>Clark v. Crosby</u>, No. 01-12940, slip op. 2937, 2946 n. 9 (11 Cir. July 2, 2003)(defining "prejudice," in context of an ineffective assistance of appellate counsel claim as "the reasonable probability that the outcome of the appeal would have been different"). Consequently, the state court rejection of the claim should not be disturbed here. <u>Williams v. Taylor</u>, <u>supra</u>.

In **claim three**, the petitioner asserts that she was denied effective assistance of counsel, where her lawyer failed to interview potential witnesses to support the petitioner's insanity defense. (DE#1:9). According to the petitioner, counsel should have interviewed petitioner's two former co-workers and personal friends, Maurice LaGuirre and Doris Rodriguez, who would have testified about the petitioner's state of mind and suicidal thoughts in the months preceding the murder.

First, it appears that the petitioner has provided no affidavit in the state forum, nor in this habeas proceeding, to establish that these witnesses would, in fact, testify as proffered. Such a bare and conclusory allegation, bereft of record support, is subject to summary dismissal. <u>Machibroda v. United States</u>, 368 U.S. 487 (1962).

Notwithstanding, calling these witnesses would have been cumulative testimony, which was elicited by the defense during cross-examination of state witnesses, as well as, by the defense's

---

to object to Dr. Carter's presence in the courtroom during Dr. Swan's testimony.

expert, Dr. Swan. In concluding that the petitioner was insane at the time of the murder, Dr. Swan testified that she conducted psychological testing of the petitioner, reviewed extensive background materials and record, and interviewed the petitioner several time, during which the petitioner had indicated that she had advised five to seven individuals that she was thinking of killing herself. (T.274-378,277-280,291-97). Moreover, during cross-examination of the state witnesses, defense counsel established that the petitioner had lost weight, appeared depressed, stressed, and with a lack of enthusiasm prior to the incident. (T.109-11). The prosecution also introduced the petitioner's suicide notes, as well as, telephone calls to her friends in Orlando during which she announced her intention to kill herself, as well as her infant daughter. (T.34-35,46,63,66,300-02,341,365-68,370). Consequently it appears that the testimonies of the witnesses would have been cumulative to evidence already presented either through direct examination or cross-examination.

Under the circumstances present here, no showing has been made in this federal proceeding that counsel was deficient or that the petitioner was prejudiced arising from counsel's failure to call these witnesses at trial. Counsel's decision should, therefore, not be questioned in this federal proceeding.[13]

---

[13]Which witnesses to call, if any, is a strategy decision that should seldom be second guessed. Conklin v. Schofield, 366 F.3d 1193, 1204 (11 Cir. 2004), cert. denied, 544 U. S. 952 (2005). See also Dorsey v. Chapman, 262 F.3d 1181, 1186 (11 Cir. 2001)(holding that petitioner did not establish ineffective assistance based on defense counsel's failure to call expert witness for the defense in that counsel's decision to not call the expert witness was not so patently unreasonable a strategic decision that no competent attorney would have chosen the strategy); United States v. Costa, 691 F.2d 1358, 1364 (11 Cir. 1982). Tactical decisions within the range of reasonable professional competence are not subject to collateral attack unless a decision was so "patently unreasonable that no competent attorney would have chosen it." Adams v. Wainwright, 709 F.2d 1443, 1445 (11 Cir. 1983). See also Waters v. Thomas, 46 F.3d 1506, 1512 (11 Cir. 1995)("Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision and it is one that [the courts] will seldom, if ever, second guess."); Chandler v. United States, 218 F.3d 1305, 1314 (11 Cir. 2000)(en

Moreover, the petitioner's proffered testimony does not alter the outcome of the proceedings, given the evidence adduced at trial. See Fugate v. Head, 261 F.3d 1206, 1239, n.54 (11th Cir. 2001)(fact that other witnesses could have been called proves only that short-comings of trial counsel can be identified, while shortcomings can be identified, perfection is not the standard of effective assistance). The evidence admitted at trial, was more than sufficient to sustain the convictions. See Jackson v. Virginia, 443 U.S. 307 (1979). Thus, even if counsel's performance could in any way be deemed deficient for failing to call these witnesses, the petitioner suffered no prejudice as a result of the alleged deficiency. Since the petitioner has not shown that there was a reasonable probability that she would have been found not guilty of the subject crimes had defense counsel called the subject witnesses, or that her insanity defense would have been successful, she cannot satisfy the second-prong of Strickland. Therefore, the state court's denial of the claim was not contrary to applicable federal constitutional principles. Consequently, the rejection of the claim should not be disturbed here. Williams v. Taylor, supra.

In **claim four,** the petitioner asserts that she was denied effective assistance of counsel, where her lawyer misadvised her to forego a jury trial and proceed with a non-jury trial on the basis that she would be unable to obtain an unbiased jury. (DE#1:10).

Florida law provides that a defendant charged with a capital

---

banc), cert. denied, 531 U.S. 1204 (2001)(holding that counsel cannot be deemed incompetent for performing in a particular way in a case as long as the approach taken "might be considered sound trial strategy")(quoting Darden v. Wainwright, 477 U.S. 168 (1986)). Further, "the absence of exculpatory witness testimony from a defense is more likely prejudicial when a conviction is based on little record evidence of guilt." Fortenberry v. Haley, 297 F.3d 1213, 1228 (11 Cir. 2002)(rejecting petitioner's ineffective assistance of counsel argument on lack of prejudice grounds despite "no conclusive forensic or eyewitness evidence" because of petitioner's "multiple uncoerced confessions").

crime is entitled to a twelve-person jury (whether or not the death
penalty is sought), and may be tried by a jury of six only when the
defendant waives that right. See State v. Griffith, 561 So.2d 528,
529 (Fla.1990) ("A defendant charged with first-degree murder[, a
crime punishable by death,] has a statutory right to trial by a
twelve-person jury."). Article 1, Section 22, of the Florida
Constitution states: "The right of trial by jury shall be secure to
all and remain inviolate. The qualifications and the number of
jurors, not fewer than six, shall be fixed by law."

However, before a defendant's waiver of the right to a jury
trial can become effective, it must be determined that defendant
expressly and intelligently consented to the waiver. See Patton v.
United States, 281 U.S. 276, 312 (1930) ("[n]ot only must the right
of the accused to a trial by a constitutional jury be jealously
preserved, [but] before any waiver can become effective, the
consent of government counsel and the sanction of the court must be
had, in addition to the express and intelligent consent of the
defendant."); Adams v. United States, 317 U.S. 269, 277 (1942)
("[O]ne charged with a serious federal crime may dispense with his
Constitutional right to jury trial, where this action is taken with
his express, intelligent consent[.]"). "[W]hether or not there is
an intelligent, competent, self-protecting waiver of jury trial by
an accused must depend upon the unique circumstances of each case."
Adams, 317 U.S. at 278. The Sixth Amendment, however, does not
require a particular colloquy by the state trial court. Cabberiza
v. Moore, 217 F.3d 1329, 1333-34 (11 Cir. 2000), cert. den'd, 531
U.S. 1170 (2001).

The petitioner has the burden to establish that her jury trial
waiver was not expressly and intelligently made. See Adams, 317
U.S. at 281 (holding that a habeas petitioner who waived his right

to counsel should bear the burden of showing that his waiver was not freely and intelligently made).

In this case, the petitioner expressly waived her right to a jury trial when she executed a written waiver of her right to trial by jury. (DE#12:Ex.1:64). Moreover, the court conducted a thorough colloquy regarding the waiver of the right. (DE#12:Ex.3:T.4-22). When asked if she had discussed with counsel the pros and cons of a jury versus a non-jury trial, the petitioner affirmatively stated that "[A]s a matter of fact, I [petitioner] made a list myself." (Id.:17). The petitioner was unequivocal that it was her intention and desire to give up her right to a jury trial, and that she was "very comfortable" with making that decision. (Id.17-20). Based upon a review of the record, the petitioner does not establish that her waiver of her right to a jury trial was not expressly and intelligently made.

Consequently, the state court's rejection of the claim in the Rule 3.850 proceeding on the bases that it was "clearly refuted by the extensive colloquy, as well as the Defendant's concession that she had initially, and consistently, desired a nonjury trial," which decision was affirmed on appeal was proper, and should not be disturbed here as it is evident that any alleged misadvice was cured by the court's extensive colloquy regarding the right which she was waiving. Therefore, no deficient performance or prejudice pursuant to Strickland has been established arising from counsel's alleged misadvice, and even if counsel was deficient for misadvising her in this regard, the petitioner nonetheless voluntarily waived her constitutional right to a jury trial. Consequently, she is entitled to no habeas relief on this claim. Williams v. Taylor, supra.

Moreover, even if counsel advised her to waive the right in exchange for the state's agreement to waive the death penalty, such a tactical decision should not be disturbed here. Under Florida law, such a tactical decision is equated with other instances wherein courts have held a defendant's personal on-the-record waiver unnecessary for a waiver to be effective. <u>State v. Griffith</u>, 561 So.2d 528, 530 -531 (Fla. 1990).

In **claim five**, the petitioner asserts that she was denied effective assistance of counsel, where her lawyer failed to object and move to strike any notes made by Dr. Shapiro on the basis that the petitioner had not waived her right to privacy and confidentiality. (DE#1:12A). According to the petitioner, Dr. Shapiro's notes[14] contained privileged communications between him and the petitioner. (<u>Id</u>.). She claims Dr. Shapiro was only authorized to provide the prosecution with results from tests and examination, but not notes containing confidential information. (<u>Id</u>.). She claims counsel should have reviewed the doctor's notes and when he realized the contents thereof, should have protected the petitioner by ensuring these notes were not disclosed or provided to the prosecution. (<u>Id</u>.; DE#12:Ex.9:14).

Under the psychotherapist-patient privilege, a patient has a privilege to refuse to disclose confidential information or records made for the purpose of diagnosis or treatment of mental conditions, including any diagnoses made by the psychotherapist. <u>See</u> <u>Fla. Stat</u>. §90.503(2); <u>see</u> <u>also</u> <u>Pauker v. Olson</u>, 834 So.2d 198, 200 (Fla. 2 DCA 2002). The psychotherapist-patient privilege, however, does not apply: (1) during involuntary commitment

_____

[14]Specifically, the doctor took notes of a conversation during which the petitioner admitting holding her daughter tightly, and putting a pillow case over the child, but when she couldn't kill her that way, she removed the pillow case, fanning the child, and ultimately reviving her. (T.449).

proceedings, (2) when there is a court-ordered mental examination, or **(3) when the patient raises and relies on the issue of his or her mental condition in litigation as part of any claim or defense.** (emphasis added); See Fla. Stat. §90.503(4); Roberson v. State, 884 So.2d at 976, 980 (Fla. 5 DCA 2004); State v. Famiglietti, 817 So.2d 901, 903 (Fla. 3 DCA 2002); State v. Rogers, 955 So.2d 1213 (Fla. 4 DCA 2007).

Review of the record in this case reveals that during cross-examination of the petitioner's expert, Dr. Swan, the prosecution attempted to discredit the expert's opinion that the petitioner was insane at the time she committed the offense. Specifically, Dr. Swan conceded that the petitioner had described in interviews how she first attempted to kill her daughter by placing a pillowcase over the child's head, and then by attempting to electrocute her, until she finally drowned the child.[15] (T.348-349).

The petitioner, however, asserts that the prosecution could only have learned of the pillowcase attempt from Dr. Shapiro's notes which were erroneously provided to them. (DE#12:Ex.9:14). She claims the prosecution capitalized upon this information during closing argument when it stated that the petitioner had attempted to suffocate her daughter prior to drowning her. (T.449; DE#12:Ex.9:14). However, even if that were the case, it is clear from Dr. Swan's testimony that the information became part of her

---

[15]There is no showing in the state forum or here that Dr. Shapiro's notes were provided to the petitioner's expert by the prosecution. Regardless, even if Dr. Swan based her testimony on a complete review of the notes and interviews conducted by Dr. Shapiro, the petitioner's prior expert, this information was not privileged, and as conceded by Dr. Swan, the petitioner's memory during those interviews was more detailed because it occurred closer in time to the offense, than at the time Dr. Swan interviewed the petitioner approximately a year later. Even if counsel had sought to suppress Dr. Shapiro's notes, no showing has been made in this habeas proceeding that such a motion would have been granted. Under these circumstances, the petitioner cannot establish prejudice pursuant to Strickland.

records regarding her interviews with petitioner, and, therefore, were readily available to the prosecution. Consequently, no deficient performance or prejudice has been established arising from counsel's failure to object or otherwise challenge this information.

To the extent the petitioner means to argue that the prosecutor engaged in prosecutorial misconduct during closing argument, that claim also fails on the merits. The standard for federal habeas corpus review of a claim of prosecutorial misconduct is whether the alleged actions rendered the entire trial fundamentally unfair. Donnelly v. DeChristoforo, 416 U.S. 637, 642-45 (1974); Hall v. Wainwright, 733 F.2d 766, 733 (11 Cir. 1984). In assessing whether the fundamental fairness of the trial has been compromised, the totality of the circumstances are to be considered in the context of the entire trial, Hance v. Zant, 696 F.2d 940 (11 Cir.), cert. den'd, 463 U.S. 1210 (1983); and "[s]uch a determination depends on whether there is a reason-able probability that, in the absence of the improper remarks, the outcome of the trial would have been different." Williams v. Weldon, 826 F.2d 1018, 1023 (11 Cir.), cert. den'd, 485 U.S. 964 (1988).

The Eleventh Circuit has held in the context of federal criminal prosecutions that prosecutorial conduct requires a new trial only if the remarks 1) were improper and 2) prejudiced the defendant's substantive rights. United States v. Cannon, 41 F.3d 1462, 1466 (11 Cir. 1995); United States v. Cole, 755 F.2d 748, 767 (11 Cir. 1985). The remarks must be reviewed in context and the probable impact upon the jury must be assessed. United States v. Cannon, supra at 1469; United States v. Stefan, 784 F.2d 1093, 1100 (11 Cir. 1986).

While the prosecutor's remarks in the instant case may possibly not be a model for prosecutorial comment, they did not deprive the petitioner of a fundamentally fair trial. The prosecutor's remarks were essentially fair comment on the evidence presented in the case and the comments were in direct response to the strategy employed by the defense, which was essentially to argue that the petitioner was insane at the time she committed the offenses.

In denying the claim in the Rule 3.850 proceeding, the court adopted the state's response which argued in pertinent part that there was no basis upon which to object, and even if there were, no prejudice has been established as there is no record support for any argument that the court relied upon inadmissible evidence in reaching its verdict. (DE#12:Ex.10:12,Ex.12). That denial was subsequently affirmed on appeal. Polanco v. State, 982 So.2d 700 (Fla. 4 DCA 2008); (DE#12:Ex.23). It is evident that the trial court's denial of the claim was not error. No Strickland prejudice arising from counsel's failure to object has been demonstrated as the outcome of the trial would not have been different, especially given the evidence adduced at trial.

Under the totality of the circumstances, including the strength of the evidence of the petitioner's guilt, it is apparent that the now-challenged actions of the prosecutor and statements were at worst no more than harmless error. See Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), quoting, Kotteakos v. United States, 328 U.S. 750, 776 (1946)(a petitioner is entitled to federal habeas corpus relief only if the constitutional error from his trial had substantial and injurious effect or influence in determining the jury's verdict). The petitioner suffered no prejudice from the alleged deficiency in that he was not deprived

of a fundamentally fair trial as a result of the challenged actions and comments. <u>See</u> <u>Harris v. Moore</u>, 1999 WL 223167, *4 (M.D.Fla. 1999); <u>Ford v. State</u>, 2001 WL 1044912, *3 (Fla. 2001)(holding that a mistrial based on prosecutorial comments is appropriate only where a statement is so prejudicial that it vitiates the entire trial). The state court's rejection of the claim was neither contrary to nor an unreasonable application of federal constitutional principles, and should therefore not be disturbed here. <u>Williams v. Taylor</u>, <u>supra</u>.

In **claim six**, the petitioner asserts that she was denied effective assistance of counsel, where her lawyer was operating under a potential conflict of interest. (DE#1:12B).

In Florida, to prove an ineffectiveness claim premised on an alleged conflict of interest, a defendant must establish that an actual conflict of interest adversely affected her lawyer's performance. <u>Herring v. State</u>, 730 So.2d 1264 (Fla.1998). A lawyer suffers from an actual conflict only when he or she actively represents conflicting interests. <u>Id</u>. To demonstrate an actual conflict, a defendant must identify specific evidence in the record that suggests that his or her interests were impaired or compromised for the benefit of a lawyer or another party. <u>Id</u>.

Federal law also holds that a conflict of interest cannot be established through hypothesis or speculation, <u>United States v. Novaton</u>, 271 F.3d 968, 1010-1011 (11th Cir. 2001), <u>citing</u> <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 348 (1980), <u>United States v. Medel</u>, 592 F.2d 1305 (5 Cir. 1979), but rather requires a showing that counsel actively represented conflicting interests. <u>United States v. Ard</u>, 731 F.2d 718 (11 Cir. 1984); <u>United States v. Panasuk</u>, 693 F.2d 1078 (11 Cir. 1982); <u>accord</u>, <u>United States v. Ettinger</u>, 344 F.3d

1149, 1161 (11th Cir. 2003). A defendant who fails to show both an actual conflict and an adverse affect is not entitled to relief. United States v. Novaton, 271 F.3d 968, 1010 (11th Cir. 2001); Burden v. Zant, 24 F.3d 1298, 1305 (11th Cir. 1994).

A defendant claiming ineffective assistance by virtue of counsel's conflict of interest must establish two elements: first, that an actual conflict of interest existed, and second, that it "adversely affected" her counsel's representation. LoConte v. Dugger, 847 F.2d 745, 754 (11 Cir. 1988). The defendant must point to specific instances in the record to suggest an actual conflict or impairment of her interest. United States v. Khoury, 901 F.2d 948, 968 (11 Cir. 1990); Lightbourne v. Dugger, 829 F.2d 1012, 1023 (11 Cir.), cert. denied, 488 U.S. 934 (1988). No such showing has been made here. At best, the record merely reflects a potential conflict, not an actual conflict. Even if the court assumes, without deciding, that an actual conflict existed, the petitioner has not demonstrated how he was adversely affected thereby.

The record reflects that defense counsel initially listed Dr. David Shapiro as a potential defense witness. However, the petitioner then filed a motion to continue the trial on the basis that "due to recent revelations, it would be catastrophic to proceed," and requested additional time to obtain a new expert so that the petitioner could be effectively represented. (DE#12:Ex.1:57-58). In the motion, defense counsel stated that he had discussed the issue with the petitioner, who indicated that she no longer wanted to use Dr. Shapiro as a witness. (Id.).

The petitioner also filed a motion in limine seeking to prohibit the prosecution from referencing or otherwise mentioning Dr. Shapiro, his notes, interviews, interns or tests performed on

34

the petitioner at trial. (DE#12:Ex.1:62). Counsel further argued in
the motion that if there were mention of Dr. Shapiro, he would be
forced to become a witness to explain why Dr. Shapiro was
discharged, or otherwise seek withdrawal as counsel. (Id.).

At the September 2, 2003 pretrial hearing, one of petitioner's
counsel[16] advised the court that he may be operating under a
potential conflict of interest because of Dr. Shapiro's departure
from the case due to his testing methodology. (DE#12:Ex.9:16;
DE#1:12B; DE#13:15). Counsel explained that Dr. Shapiro was
stricken as a defense expert after questions arose regarding the
doctor's methodology. (Id.). Counsel reasoned that an actual
conflict would not arise in the event the petitioner proceeded with
her desire for a non-jury trial because he opined that the court,
as the trier of fact, would be able to exclude Dr. Shapiro from its
determination of the petitioner's guilt. However, he believed that
if information regarding Dr. Shapiro were disclosed, then either he
would have to testify or be forced to call Dr. Shapiro to explain
why Dr. Shapiro was discharged. (Id.). After full consultation with
the petitioner, counsel did not believe he would be required to
withdraw because the petitioner was still insisting on a non-jury
trial. (Id.). As will be recalled, the petitioner was then
extensively colloquied on the issue, confirming counsel had
discussed the issue regarding Dr. Shapiro with her. (Id.). The
petitioner further affirmatively stated that she was very
comfortable with both her attorneys, and was always desirous of
having a nonjury trial. (Id.).

In rejecting this claim in the Rule 3.850 proceeding, the
court adopted the state's response thereto, which argued correctly

---

[16]Because the charges involved a capital offense, the petitioner was
assigned two attorneys to represent her.

that the petitioner "waived any claim of conflict of interest," and alternatively, that in order to prevail on the claim, "there must be an actual, as opposed to a potential, conflict of interest, which adversely affected counsel's performance." (DE#12:Ex.10:16; Ex.12). Here, the possibility that counsel might be called as a witness, or that there might be a potential conflict is insufficient to warrant relief. There must be an actual conflict, which has adversely affected the petitioner. No such showing has been made here.

Under these circumstances, the state courts' rejection of this claim was both factually reasonable and in accord with applicable federal authorities. Williams v. Taylor, supra. From the record, it is apparent that the petitioner failed to meet her burden of showing an actual conflict of interest, or that he suffered an actual impairment of his interest as a result. For these reasons, federal relief is not warranted on this claim. Cuyler v. Sullivan, supra.

In **claim seven**, the petitioner asserts that the cumulative errors by counsel deprived the petitioner of a fundamentally fair trial. (DE#1:12C).

For the reasons stated in this Report, the petitioner is not entitled to habeas corpus relief on any of her ineffective assistance of counsel claims. When viewing the evidence in this case in its entirety, the alleged errors, neither individually nor cumulatively, infused the trial with unfairness as to deny petitioner a fundamentally fair trial and due process of law. Therefore, the petitioner is not entitled to habeas corpus relief. See Fuller v. Roe, 182 F.3d 699, 704 (9 Cir. 1999)(holding in federal habeas corpus proceeding that where there is no single

constitutional error existing, nothing can accumulate to the level of a constitutional violation), overruled on other grounds, Slack v. McDaniel, 529 U.S. 473, 482 (2000). See also United States v. Rivera, 900 F.2d 1462, 1470 (10 Cir. 1990)(stating that "a cumulative-error analysis aggregates only actual errors to determine their cumulative effect.").

Contrary to the petitioner's apparent assertion, the result of the trial was not fundamentally unfair or unreliable. See Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993). The fact that the defense presented at trial was not successful does not mean that counsel's performance was constitutionally ineffective. Defense counsel did not entirely fail to subject the prosecution's case to meaningful adversarial testing.[17] United States v. Cronic, 466 U.S. 648, 659 (1984).

The record reflects that the petitioner received vigorous and able representation more than adequate under the Sixth Amendment standard. See Strickland v. Washington, 466 U.S. 668 (1984). Defense counsel made a reasonable investigation of the facts, was well-prepared for trial, conducted full and extensive cross-examination of the state's witnesses, made appropriate objections, moved for judgment of acquittal, and presented a forceful closing argument.

---

[17]It appears that the petitioner might be attempting to raise a claim pursuant to United States v. Cronic, 466 U.S. 648 (1984). In some cases, counsel's failure or inability to subject the prosecution's case to meaningful adversarial testing violates the Sixth Amendment and makes the adversarial process presumptively unreliable. Id. at 659. When such a violation occurs, so as to render the trial presumptively unreasonable, no specific showing of prejudice is required. Id. The Eleventh Circuit applies the Cronic dicta only in a "narrow range of cases" where there is a "fundamental breakdown of the adversarial process," Chadwick v. Green, 740 F.2d 897, 900-01 (11 Cir. 1984), and concentrates instead on whether or not the accused was denied a fair trial. Hammonds v. Newsome, 816 F.2d 611, 613 (11 Cir. 1987). In this case, the petitioner was in no way denied a fair trial. As indicated herein, the record demonstrates that counsel subjected the state's case to a meaningful challenge.

Under these circumstances, the state court's rejection of this claim in the Rule 3.850 proceeding on the basis that no cumulative error had been established, should not be disturbed here as it does not violate and federal constitutional principles. <u>Williams v. Taylor</u>, <u>supra</u>.

In **claim eight**, the petitioner asserts that she was denied effective assistance of counsel, where her lawyer failed to advise the court that the petitioner had stopped taking her psychotropic medication at the time she waived her right to a jury trial, thereby rendering her waiver not knowing and voluntary. (DE#1:12D). The petitioner claims that after her attempted suicide, she was prescribed Visteril, an anti-anxiety medication, and Prozac, an anti-depressant. (DE#12:Ex.11). According to the petitioner, shortly before the hearing on her waiver of her constitutional right to a jury trial, she advised counsel that she had stopped taking her medications "cold turkey," but counsel failed to advise the court accordingly, nor did he question her regarding her mental ability to proceed with the waiver. (<u>Id</u>.). The petitioner claims that during her withdrawal from these medications, she felt numb, indifferent, depressed, and claims was unable to properly form a competent decision. (<u>Id</u>.:3).

As previously narrated in this Report, review of the record (DE#12:Ex.3) reveals that the petitioner was able to coherently participate in the extensive colloquy conducted by the court regarding her waiver. She was able to formulate proper responses to the questions, and provide insight and explanations regarding her decision. There is nothing of record, other than the petitioner's self-serving allegations, to establish that she was incompetent at the time of that hearing. In fact, at the hearing, Attorney Ongley, one of the petitioner's counsel, apprised the court that he had no

question as to the petitioner's competency as she had been evaluated by two doctors, and was no longer in need of medications. (DE#12:Ex.3:19-20). Counsel further explained that the petitioner had been active in participating in her defense, articulating a lot of legal issues. (Id.). Moreover, the petitioner's second counsel, Ms. Coward, also agreed with Attorney Ongley's assessment in this regard. (Id.). There is nothing to suggest that the petitioner was anything other than competent and coherent during the colloquy. Thus, even if the petitioner took herself off her medications, no showing has been made either in the state forum or this habeas proceeding that she was incompetent or otherwise unable to understand the nature of the proceedings.

When the identical claim was raised in the state forum in the Rule 3.850 proceeding, it was denied on the basis that Polanco's "own detailed and responsive answers during the colloquy would belie any assertion of incompetency." (DE#12:Ex.13:4-5; Ex.18). That decision was subsequently affirmed on appeal. Polanco v. State, 982 So.2d 700 (Fla. 4 DCA 2008); (DE#12:Ex.23). Based on the record before this court, the state court's finding in this regard was neither contrary to nor an unreasonable application of federal constitutional principles, and should therefore not be disturbed here. Williams v. Taylor, supra.

## Trial Court Error Claims

Before turning to a discussion on the merits of claims nine and ten of this federal petition, it should be noted that these claims appear to be unexhausted and prospectively procedurally barred from review in this habeas petition.

Although the respondent sets forth the law regarding

exhaustion in its response, it does not indicate whether it is asserting the bar. Claims nine and ten of this federal petition are unexhausted because the petition merely raised issues of state law, rendering the challenges not cognizable in this federal habeas corpus proceeding. Although the petitioner raised these claims on direct appeal, she did not assert a Fourteenth Amendment violation. Furthermore, the petitioner's direct appeal argument relied exclusively on state law substantive arguments and cited only to state cases. Thus, the petitioner has failed to exhaust these claims. See 28 U.S.C. §2254(b)(1) and (b)(1)(A)(A state prisoner's habeas corpus petition "shall not be granted unless it appears that--the applicant has exhausted the remedies available in the courts of the State...."). See also Bailey v. Nagle, 172 F.3d 1299, 1302-03 (11 Cir. 1999).

The AEDPA requires a state prisoner to exhaust all available state court remedies, either on direct appeal or in a state post-conviction proceeding, 28 U.S.C. § 2254(b)-(c), thereby giving the state the opportunity to correct its alleged violations of federal rights. Baldwin v. Reese, 541 U.S. 27, 29 (2004). The exhaustion doctrine requires the petitioner to "fairly present" his federal claim to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right. Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275 (1971)). Exhaustion is not satisfied "merely" if the petitioner presents the state court with "all the facts necessary to support the claim" or even if a "somewhat similar state-law claim was made." Kelley v. Sec'y for Dept. of Corr., 377 F.3d 1317, 1344 (11th Cir. 2004) (citation omitted). The petitioner must instead "present his claims to the state courts such that they are permitted the 'opportunity to apply controlling legal principles to the facts bearing upon his constitutional

claim.'" Id. (quoting Picard, 404 U.S. at 277).

"'Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.'" Jimenez v. Fla. Dep't of Corr., 481 F.3d 1337, 1342 (11th Cir. 2007)(quoting Snowden v. Singletary, 135 F.3d 732, 735 (11th Cir. 1998))(concluding that the issue was raised where the petitioner did not specifically state on direct appeal that these issues were to be reviewed under the Federal Constitution, but he provided enough information about the claims (including cites to Supreme Court cases) to notify the state courts that the challenges were being made on both state and federal grounds.). "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Baldwin, 541 U.S. at 32.

In this case, however, the petitioner cited exclusively to state cases, and all of her substantive arguments addressed Florida law. None of the cases she cited were decided on federal grounds and she did not otherwise indicate that she intended to raise federal claims. Baldwin, 541 U.S. at 32.

Moreover, the petitioner would now be barred from raising her constitutional claim before the state court. Florida law procedurally bars new claims or claims that have already been raised in prior petitions when "the circumstances upon which they are based were known or should have been known at the time the prior petition was filed." Johnson v. Singletary, 647 So.2d 106, 109 (Fla. 1994). In order to overcome this procedural bar in

41

federal court, petitioners must "demonstrate cause for the default
and actual prejudice as a result of the alleged violation of
federal law, or demonstrate that failure to consider the claims
will result in a fundamental miscarriage of justice." Coleman v.
Thompson, 501 U.S. 722, 750 (1991); Smith v. Jones, 256 F.3d 1135,
1138 (11th Cir. 2001). The petitioner has neither alleged nor shown
either cause or prejudice that would excuse the default. Likewise,
the petitioner has neither alleged nor shown the applicability of
the actual innocence exception. A review of the record reveals that
the petitioner is unable to satisfy either of the exceptions to the
procedural default bar. Therefore, the claims are procedurally
barred. Notwithstanding, the claims are addressed on the merits in
the alternative because relief is precluded by §2254(d).

In **claim nine**, the petitioner asserts that the trial court
erred in admitting the testimony of Dr. Bourg-Carter as an expert,
where there was an insufficient predicate to permit his testimony
which was based on speculation and facts not in evidence, in
violation of the petitioner's constitutional rights. (DE#1:12E).

Initially, it should be noted that this claim fails on the
merits because in non-jury trials, such as the one held here, the
judge, as a finder of fact, is presumed to have disregarded any
inadmissible evidence or improper argument. See Guzman v. State,
868 So.2d 498, 511 (Fla. 2003), citing, First Atlantic Nat'l Bank
of Daytona Beach v. Cobbett, 82 So.2d 870, 871 (Fla. 1955) (stating
that a judge trying a case without a jury "is in a position to
evaluate the testimony and discard that which is improper or which
has little or no evidentiary value"). Even where a judge
erroneously admits improper evidence, the judge as fact finder is
presumed to disregard it. See, Guzman v. State, supra, citing,
e.g., State v. Arroyo, 422 So.2d 50, 51 (Fla. 3d DCA 1982); see

also, <u>C.W. v. State</u>, 793 So.2d 74 (Fla. 4 DCA 2001); <u>M.T. v. State</u>, 805 So.2d 76 (Fla. 4 DCA 2002). In this case, the trial court was the fact finder and there is nothing of record to suggest that it relied upon Dr. Bourg-Carter's rebuttal testimony when it found the petitioner guilty as charged. (T.488).

Regardless, relief on the merits is precluded by §2254(d). According to the petitioner, there was no evidence concerning the nature of Shapiro's testing and whether changes to the petitioner's answers on tests were changed by him or his staff, therefore, Dr. Bourg-Carter's rebuttal testimony concerning this matter was entirely collateral, and should not have been permitted. Review of the record, however, reveals that the defense's expert, Dr. Swan, testified that she was aware the petitioner had undergone prior psychological testing, and she was able to review those tests, as well as, the depositions of Dr. Shapiro and those individuals who administered the prior tests. (T.306-07,326-27). Dr. Swan indicated that the results of her test were not invalidated by the findings in the prior tests nor did she rely upon those tests in formulating her findings.  (T.326-27). Dr. Swan testified she looked at jail records and the petitioner's entire history in order to reach her conclusion concerning the petitioner's sanity at the time of the offenses. (T.332-34). In order to explain the discrepancy between her test results and the medical records from the jail, Dr. Swan stated that she took the records from the certified health professionals at the jail "with a grain of salt" because she speculated such professionals are "overworked and they don't really spend a lot of time where they actually go in and they assess the thinking." (T.334-35).

In rebuttal, the prosecutor called Dr. Sheri Bourg-Carter, a forensic psychologist, who testified regarding forensic testing

methodology. (T.393). Dr. Bourg-Carter explained that the MMPI has critical items or issues that are flagged in the scoring process. (T.395). According to Dr. Bourg-Carter, it would be dangerous to go back over the results of the MMPI with a defendant in a forensic case because the defendant could be cued on how to respond. (T.397-98). Dr. Bourg-Carter explained that as to the petitioner, there was a big difference between the results in the first and second MMPI tests administered by Dr. Shapiro, and although the inconsistencies between the two may not be the petitioner's fault, her scores on the depression issue increased dramatically on the second test. (T.399,402-03). She explained that the inconsistencies between the two tests administered by Dr. Shapiro can be explained by whatever the intern and Dr. Shapiro did regarding the initial administration of the MMPI. (T.410-11). Moreover, notes from the nurses in the jail where the petitioner was confined did not reflect that the petitioner was floridly psychotic, nor acting crazy, as would be the case if she were floridly psychotic. (T.404-07). This fact would also be reflected in both the MMPI and Million tests administered by Dr. Swan. (T.408). However, no such showing was reflected in the Million test. (Id.).

The prosecution next asked, over objection from the defense, a hypothetical question. (T.412-13). Specifically, the prosecution inquired whether a depressed individual can have a psychotic break after learning that they were in the hospital for attempting to commit suicide and killing their child. (Id.). Defense objected on the basis that it was beyond the scope of rebuttal and assumed facts not in evidence. (Id.). The objection was overruled, at which point Dr. Bourg-Carter opined that any kind of severe trauma can cause an already vulnerable person to go into a psychotic break. (Id.).

Under Florida law, it is proper for a party to fully inquire into the history utilized by an expert to determine whether the expert's opinion has a proper basis. See Parker v. State, 476 So.2d 134, 139 (Fla. 1985); Bonifay v. State, 626 So.2d 1310, 1312 (Fla. 1993); Britton v. State, 414 So.2d 638, 639 (Fla. 5 DCA 1982)(rebuttal evidence explains or contradicts material evidence offered by a defendant). Thus, it appears that Dr. Bourg-Carter's testimony did not criticize Dr. Swan's testimony, but rather clarified that she reviewed the medical records from the jail in order to determine if they were consistent with the results of Dr. Swan's test, to-wit, the third MMPI. (T.403-11). Therefore, the admission of Dr. Bourg-Carter's rebuttal testimony was proper.

Regardless, any alleged error in admission of the rebuttal testimony was, at best, harmless, given the more than sufficient evidence adduced at trial that revealed the petitioner was sane when she murdered her two-year old daughter. As will be recalled, the day before the murder, the petitioner actively participated in her divorce mediation proceeding. On the day of the murder, she went to work, dropping off her daughter at the caretaker's home, and then later retrieving her from the caretaker on the basis that the infant had a fictitious doctor's appointment. Moreover, the petitioner prepared a suicide note addressed to her husband, which she then placed in a friend's mailbox, directing that certain debts be paid and even specifying the type of clothes to be placed on her and her daughter for the funeral. The post-it notes attached to the suicide note, which were addressed to her friend also confirm that the petitioner was aware of her actions, and begged her friend to forgive her and to pray to God for forgiveness. Finally, the evidence demonstrated that the petitioner attempted first to strangle the infant, then tried to electrocute her, but when the breakers were tripped, she then ultimately drowned the infant.

Taken together, these actions establish that the petitioner was thinking rationally, was able to coherently solve problems while committing a heinous act.

Under the totality of the circumstances present here, the admission of the testimony did not result in an unfair trial. See Estelle v. McGuire, 502 U.S. 62 (1991). See also Osborne v. Wainwright, 720 F.2d 1237, 1238 (11 Cir. 1983); Jameson v. Wainwright, 719 F.2d 1125 (11 Cir. 1983); DeBenedictus v. Wainwright, 674 F.2d 841, 843 (11 Cir. 1982). In general, federal courts are reluctant to second-guess state evidentiary rulings, recognizing that states deserve wide latitude in that area, Maness v. Wainwright, 512 F.2d 88, 92 (5 Cir. 1975), so federal habeas corpus relief is rarely deemed appropriate for claims predicated on allegations of state evidentiary error. Boykins v. Wainwright, 737 F.2d 1539, 1543-44 (11 Cir.), cert. denied, 470 U.S. 1059 (1985). Moreover, such evidentiary rulings are subject to the harmless error analysis and will support habeas relief only if the error "had substantial and injurious effect or influence in determining the jury's verdict." Sims v. Singletary, 155 F.3d at 1312, quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). Thus, the claim fails because the state trial court correctly applied its own evidentiary rules. Even assuming, without deciding, that the trial court erroneously permitted the testimony of Dr. Bourg-Carter, the petitioner cannot show that she was prejudiced thereby. Any error, therefore, did not have a "substantial and injurious effect or influence in determining the verdict." See Brecht v. Abrahamson, 507 U.S. at 637-38 (quoting Kotteakos v. United States, 328 U.S. at 776).

Thus, the state appellate court's affirmance on direct appeal of the petitioner's convictions and sentences was factually

reasonable and in accordance with applicable federal principles and should, therefore, stand. 28 U.S.C. §2254(d)(1); <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000).

In **claim ten**, the petitioner asserts that the trial court erred in overruling the petitioner's objection to the prosecution's hypothetical question posed to Dr. Bourg-Carter regarding whether a generally depressed homicide suspect could become psychotic after a suicide attempt after regaining consciousness in the hospital and learning that her daughter was dead. (DE#1:12F). This claim is a mere reiteration of the arguments raised in relation to claim nine above and should be denied for the reasons expressed therein.

Moreover, under Florida law, it is not necessary for a hypothetical question to be limited to only the facts that are directly established by the evidence, but can be based upon an assumed state of facts which the evidence in the record tends to prove, even by inference. <u>See</u> <u>Burnham v. State</u>, 497 So.2d 904, 906 (Fla. 2 DCA 1986); <u>Christiansen v. State</u>, 280 So.2d 41 (Fla. 3 DCA 1973). Therefore, the state appellate court's rejection of this claim on direct appeal was factually reasonable and in accordance with applicable federal principles and should, therefore, stand. 28 U.S.C. §2254(d)(1); <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000).

In **claim eleven**, the petitioner asserts that the trial court erred in failing to recognize the privileged and confidential nature of the mediation proceedings. (DE#1:12G).

Under <u>Fla. Stat</u>. §44.405, a privilege exists for all mediation parties regarding mediation communications. However, <u>Fla. Stat</u>. §39.204 abrogates the various evidentiary privileges in cases

involving child abuse, abandonment, or neglect. Specifically, <u>Fla.Stat.</u> §39.204 provides:

> The privileged quality of communication between husband and wife and between any professional person and his or her patient or client, and any other privileged communication except that between attorney and client or the privilege provided in s.90.505, as such communication relates both to the competency of the witness and to the exclusion of confidential communications, shall not apply to any communication involving the perpetrator or alleged perpetrator in any situation involving known or suspected child abuse, abandonment, or neglect and shall not constitute grounds for failure to report as required by s. 39.201 regardless of the source of the information requiring the report, failure to cooperate with law enforcement or the department in its activities pursuant to this chapter, or failure to give evidence in any judicial proceeding relating to child abuse, abandonment, or neglect.

<u>See</u> <u>also</u>, <u>e.g.</u>, <u>Carson v. Jackson</u>, 466 So.2d 1188, 1192 (Fla. 4th DCA 1985)(providing that abrogation of privilege applied only to communications dealing with child abuse or neglect, while the privilege provision continued in effect as to other communications); <u>Hill v. State</u>, 846 So.2d 1208 (Fla. 5th DCA 2003) (recognizing that the charge of child neglect could not open the door to discovery of all defendant's psychological records, only those relevant to the child neglect charge).

Review of the record in this case reveals that the petitioner's divorce attorney, Gerard Cutrone, Esquire, and the mediator, Diane Blank, testified regarding their observations, not privileged communications with the petitioner. As previously noted in this Report, Attorney Cutrone recalled that there was nothing unusual in the petitioner's behavior on the day of the mediation, which was the day prior to the murder. (T.135-37). Likewise, the divorce mediator, Diane Blank, also testified at trial regarding

48

her observations of the petitioner during the mediation. (T.205-06). Blank also explained that if she had perceived there was an observable threat that someone might be a danger to themselves or others, she would immediately have stopped the mediation. (Id.). In this case, Blank recalled that the petitioner was dressed appropriately and spoke properly during the proceedings. (T.207).

Under the circumstances present here, it was not error to admit the testimonies of these witnesses concerning their observations of the petitioner on the day before the murder. See e.g., Malinauskas v. United States, 505 So.2d 649, 655 (5th Cir. 1974)(counsel who consulted with defendant prior to guilty plea did not reveal privileged communication when he testified based on his observations as to defendant's competence at time of plea); Clanton v. United States, 488 F.2d 1069 (9th Cir. 1974)(attorney-client privilege does not preclude attorney from testifying about his observations); Provenzano v. Singletary, 3 F.Supp.2d 1351, 1367 (M.D. Fla. 1997)(privilege did not protect petitioner's attorney from testing regarding the defendant's appearance and state-of-mind the day before shooting incident).

Even if the court erred in admitting this evidence, and assuming further that the witnesses did testify as to privileged information as alleged by petitioner, as previously discussed in relation to claims nine and ten above, the trial court, as the fact finder in the petitioner's non-jury trial is presumed to have disregarded such evidence. Guzman v. State, 868 So.2d at 511. No showing has been made either in the state forum or this habeas proceeding that the court relied upon this evidence or was otherwise unable to disregard the evidence when it arrived at a verdict. In fact, given the more than sufficient evidence adduced at trial, no showing has been made that the petitioner's right to

a fair trial was compromised because of the testimony of these witnesses. Consequently, the state appellate court's rejection of this claim on direct appeal was factually reasonable and in accordance with applicable federal principles and should, therefore, stand. 28 U.S.C. §2254(d)(1); Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

In conclusion, it is clear from the record when viewed as a whole that the petitioner received able representation more than adequate under the Sixth Amendment standard. See Strickland v. Washington, 466 U.S. 668 (1984). The grounds raised herein are meritless for the reasons stated. Moreover, the claims identified above, as raised by the petitioner in the state forum, and the state court's determination that the petitioner was not entitled to relief on those claims of ineffective assistance of counsel, which decision was affirmed on appeal, as well as, those raised and rejected on direct appeal, were not in conflict with clearly established federal law or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[18] Relief must therefore be denied pursuant to 28 U.S.C. §2254(d). Williams v. Taylor, 529 U.S. 362 (2000).

Lastly, to the extent the petitioner appears to argue that she is entitled to a federal evidentiary hearing on her claims, that

---

[18]The trial court's decision in the Rule 3.850 proceeding was affirmed on appeal. The appellate court's decision constitutes an "adjudication on the merits," and is thus entitled to deference under the Antiterrorism and Effective Death Penalty Act (AEDPA) for purposes of subsequent federal habeas corpus review, even though the state court did not issue an opinion providing any discussion with respect to the claims. Wright v. Secretary for Dept. of Corrections,278 F.3d 1245 (11 Cir. 2002), cert. denied, 538 U.S. 906 (2003). The petitioner is only entitled to relief if the state appellate court's rejection of his claims was directly contrary to, or was an unreasonable application of, clearly established federal law. Id. at 1253-56. See also Van Poyck v. Florida Dept. of Corrections, 290 F.3d 1318, 1325 (11 Cir. 2002). For the reasons stated herein, the appellate court's decision affirming the denial of the petitioner's Rule 3.850 motion on the subject issues was not unreasonable, and she is therefore not entitled to relief in this federal proceeding.

claim also warrants no habeas corpus relief here. If a habeas corpus petitioner "alleges facts that, if true, would entitle him to relief, then the district court should order an evidentiary hearing and rule on the merits of the claim." Holmes v. United States, 876 F.2d 1545, 1552 (11 Cir. 1989), quoting Slicker v. Wainwright, 809 F.2d 768, 770 (11 Cir. 1987). However, no hearing is required where the petitioner's allegations are affirmatively contradicted by the record, or the claims are patently frivolous. Holmes, supra at 1553. Here, for the reasons which have been discussed, the petitioner's claims are all affirmatively contradicted by the existing record, so no federal hearing is necessary or warranted.

<u>Conclusion</u>

For the foregoing reasons, it is recommended that this petition for habeas corpus relief be denied.

Objections to this report may be filed with the District Judge within fourteen days of receipt of a copy of the report.

Signed this 19th day of April, 2010.

UNITED STATES MAGISTRATE JUDGE

cc:   Eulie Polanco, Pro Se
      DC#163184
      Homestead Correctional Institution
      19000 S.W. 377th Street
      Florida City, FL 33034-6499

      Laura Fisher Zibura, Ass't Atty Gen'l
      Office of the Attorney General
      1515 North Flagler Drive, #900
      West Palm Beach, FL 33401-3432